UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARTHA F. YEOMAS,

                  Plaintiff,

        v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

<u>DECISION & ORDER</u>

13-CV-6276P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Martha F. Yeomas ("Yeomas") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income Benefits ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 8).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 9, 10). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.     Procedural Background

Yeomas applied for SSI on November 5, 2010, alleging disability beginning on January 1, 2000, due to a lower back injury, arthritis, high blood pressure, diabetes, asthma and chronic obstructive pulmonary disease ("COPD").  (Tr. 156, 160).[1]  On March 16, 2011, the Social Security Administration denied Yeomas's claim for benefits, finding that she was not disabled.[2]  (Tr. 55).  Yeomas requested and was granted a hearing before Administrative Law John P. Costello (the "ALJ").  (Tr. 84, 85-92, 93-97).  The ALJ conducted a hearing on February 14, 2012 in Rochester, New York.  (Tr. 9-45).  In a decision dated March 21, 2012, the ALJ found that Yeomas was not disabled and was not entitled to benefits.  (Tr. 65-75).

On April 2, 2013, the Appeals Council denied Yeomas's request for review of the ALJ's decision.  (Tr. 3-8).  Yeomas commenced this action on May 30, 2013 seeking review of the Commissioner's decision.  (Docket # 1).

### II.     Relevant Medical Evidence[3]

#### A.     Treatment Records

##### 1.     Paul K. Maurer, MD

Treatment notes indicate that Yeomas began treating with Paul K. Maurer ("Maurer"), MD, in January 2002.  (Tr. 397).  According to the notes, on January 1, 2002, Yeomas was admitted to Rochester General Hospital ("RGH") after she visited the Emergency Department complaining of low back pain with radiation and numbness to both of her legs.  (Id.).

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Yeomas's previous application for SSI had been denied on December 22, 2009.  (Tr. 46).

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

According to the notes, Yeomas reported that her symptoms presented after she had a significant coughing spell. (*Id.*). An MRI revealed a herniated disc at L4-5. (*Id.*). Yeomas's symptoms improved and she underwent physical therapy before being discharged. (*Id.*).

Maurer reviewed Yeomas's records and recommended against surgery because she had improved, but advised Yeomas that he would reevaluate if there were any neurological changes. (Tr. 396). On January 23, 2002, Yeomas failed to attend a scheduled appointment with Maurer. (*Id.*). On February 9, 2002, Yeomas was evaluated by Maurer. (Tr. 395). Yeomas demonstrated ongoing symptoms, including a halting and cautious gait and lower extremity pain in both her legs. (*Id.*). Based upon her symptoms, Maurer recommended surgery due to a "fairly dramatic compression of the spinal sac at the L4-5 region." (*Id.*). On March 5, 2002, Maurer performed a bilateral decompressive lumbar laminectomy with discectomy at L4-5. (Tr. 394).

On October 28, 2002, imaging was conducted to evaluate a possible recurrent disc herniation at L4-5. (Tr. 392). According to Margaret H. Ormanoski, DO, the scans demonstrated that there were no vertebral body compression fractures or spine misalignment. (*Id.*). The scans revealed a minimal diffuse disc bulge at L3-4 with a mild mass effect upon the central canal with no neural foraminal narrowing or focal disc protrusion or extrusion. (*Id.*). At L4-5, post-operative changes were observed consistent with Yeomas's previous surgery. (*Id.*). In addition, the images revealed scar tissue around the thecal sac and the L5 nerve roots and a minimal bulging disc, but no evidence of recurrent disc herniation. (*Id.*).

According to Maurer, at L5-S1, there was a diffuse disc bulge and a mild mass effect upon the thecal sac and the S1 nerve root, posterior element degenerative change including ligamentum falvum and facet joint hypertrophy, but no neural foraminal narrowing. (Tr. 393). After reviewing the imaging results, Maurer opined that no significant recurrent disc herniation

or stenosis were present and that the images demonstrated expected post-operative changes.

(Tr. 391).  Based upon those results, Maurer did not recommend surgery.  (*Id.*).

Yeomas returned to Maurer in January 2003 with improvement in her lower
extremity symptoms, but complaints of pain in her lumbar spine.  (Tr. 390).  Maurer indicated
that Yeomas's symptoms suggested that she was suffering from a mechanical dysfunction, rather
than a neural compressive issue.  (*Id.*).  Maurer indicated that he would be reluctant to
recommend surgery and that more conservative options should be explored.  (*Id.*).  Maurer
recommended that Yeomas wear a "Warm-N-Form" back support daily for four weeks.  (*Id.*).
Maurer discontinued Yeomas's Vicodin prescription and prescribed Darvocet.  (*Id.*).

On June 5, 2003, Yeomas attended a follow-up appointment with Maurer.
(Tr. 388).  Yeomas continued to experience "significant discomfort" due to mechanical back
pain.  (*Id.*).  Given her ongoing discomfort, Maurer considered further surgery, but cautioned that
it would not be a "cure all" and that Yeomas might continue to experience discomfort.  (*Id.*).
Maurer also counseled Yeomas about her use of Vicodin.  (*Id.*).

On January 18, 2007, Yeomas had an MRI of her lumbar spine.  (Tr. 385).  The
radiologist opined that the imaging demonstrated mild degenerative disc disease at L4-5 and
L5-S1 that had progressed from the prior images.  (*Id.*).  In addition, he noted surgical changes at
L4-5 with posterior decompression of the thecal sac and no central canal stenosis.  (*Id.*).  A
diffuse disc bulge with a small central disc protrusion abutting the bilateral S1 nerve roots was
evident at L5-S1.  (*Id.*).  Additionally, the radiologist noted a mild diffuse disc bulge at T12-L1
that was not present on previous images.  (*Id.*).  In June 2011 the Social Security Administration
requested that Maurer complete a medical questionnaire evaluating Yeomas, but Maurer declined
to complete the questionnaire because he had not treated her since 2007.  (Tr. 384).

2.     **RGH Records**[4]

Treatment records indicate that Yeomas received treatment at RGH's TWIG clinic beginning in February 2009.  (Tr. 263).  During that month, Yeomas attended two appointments complaining of low back pain and right shoulder pain.  (Tr. 263-64, 299).  Yeomas reported that she had previously undergone back surgery with Maurer and had experienced pain in her right shoulder since the surgery.  (*Id.*).  Treatment notes indicate that the straight leg test Yeomas had was positive on the right and negative on the left.  (*Id.*).  The notes also indicate that an examination of her shoulder was limited due to her complaints of pain.  (*Id.*).  Yeomas missed her follow-up appointments in March and April.  (Tr. 265-67).

In April 2009, Yeomas returned to the clinic complaining of low back pain.  (Tr. 268).  The notes indicate that Yeomas requested a refill of her pain medication and that she had failed to obtain an epidural injection.  (Tr. 268, 298).  In May 2009, Yeomas was advised to follow-up with Maurer for her ongoing back pain.  (Tr. 270, 298).  In June 2009, Yeomas returned to the clinic with continued complaints of chronic lower back pain, as well as pain in her right toe.  (Tr. 271-72).  The notes also indicate that Yeomas had been diagnosed with diabetes.  (Tr. 271).  Yeomas continued to attend medical appointments in July, August, October and December and received ongoing treatment and monitoring of her diabetes.  (Tr. 273-79).

In January 2010, Yeomas attended an appointment at the clinic complaining of continued pain in her back and abdomen, requested Vicodin and indicated that she wanted to be placed on disability.  (Tr. 280).  Yeomas underwent a hysterectomy in June 2010.  (Tr. 281-82, 308).  On December 3, 2010, Yeomas presented in the RGH Emergency Department with complaints of back pain.  (Tr. 330-31).  Yeomas reported that she had been experiencing pain for

---

[4]   These records are handwritten and often hard to decipher.  The Court has summarized the relevant legible treatment notes.

approximately two days and had suffered similar episodes in the past, but had not received recent treatment. (*Id.*). An examination demonstrated pain in Yeomas's lower back with movement, but no decreased range of motion. (*Id.*). Yeomas was given a prescription for Naprosyn and Norco and advised to follow-up with her doctor. (*Id.*).

On January 8, 2011, Yeomas returned to the Emergency Department complaining of low back pain that she had been experiencing for a week. (Tr. 332-33). Yeomas was able to ambulate without difficulty, although she had decreased range of motion in her back. (Tr. 332). On January 19, 2011, the TWIG clinic provided Yeomas with a note stating that she could lift no more than ten pounds and that she needed assistance with her housework. (Tr. 422). On January 26, 2011, Yeomas attended an appointment at the TWIG clinic complaining of back pain. (Tr. 284). Upon examination, Yeomas demonstrated very tender lumbar spine with decreased range of motion. (*Id.*). Yeomas was prescribed Flexeril, Naprosyn and Vicodin and advised that if her symptoms did not improve she would need to follow-up with neurosurgery. (Tr. 285). She was also instructed to resume her medications for diabetes and high blood pressure. (*Id.*). Yeomas was provided a note from Physician's Assistant Stacey Gombetto ("Gombetto") excusing her from work until January 31, 2011, after which she could return to work without limitations. (Tr. 370-71).

On April 12, 2011, Yeomas was referred to Maurer for an assessment of her ongoing back pain. (Tr. 372). On May 13, 2011, Yeomas presented in the RGH Emergency Department complaining of back pain. (Tr. 374, 409-21). Yeomas indicated that her symptoms started after she had carried a "couple loads of laundry" up the stairs. (Tr. 412). Yeomas reported experiencing similar "flare ups" every couple months. (*Id.*). An examination demonstrated back pain with movement. (*Id.*). Yeomas was advised to follow-up with her

doctor and to consider physical therapy for her back pain.  (Tr. 413).  She was prescribed Norco

and discharged.  (Tr. 374, 414).  On June 27, 2011, Yeomas returned to the Emergency

Department complaining of difficulty breathing.  (Tr. 401-08).

On January 19, 2012, Yeomas slipped and fell on ice.  (Tr. 424).  Notes indicate

that she went to the Emergency Department and received a prescription for Vicodin.  (*Id.*).  On

January 24, 2012, Gombetto provided a note that restricted Yeomas from lifting more than ten

pounds for at least eight weeks due to a back injury.  (Tr. 423).

### 3.    Genesee Mental Health Center

The record contains treatment notes from Genesee Mental Health Center

("GMHC") beginning in March 2011.  (Tr. 431-34).  Yeomas reported that she was living in a

halfway house and had previously received mental health treatment at Project Restart, where she

was currently receiving chemical dependency treatment.  (*Id.*).  The notes indicate that Yeomas

previously received mental health treatment at GMHC.  (*Id.*).  Yeomas reported symptoms of

depression, including sadness, anhedonia, tearfulness, lack of focus and sleep, decreased appetite

and frequent nightmares.  (*Id.*).  According to Yeomas, these symptoms occur during her

"sporadic periods of sobriety."  (*Id.*).  Yeomas reported a history of cocaine and marijuana

dependency.  (*Id.*).  Richard D. Locey ("Locey"), LMSW, diagnosed Yeomas with depressive

disorder, not otherwise specified and cocaine dependence, and assessed a Global Assessment of

Functioning ("GAF") of 58.  (*Id.*).  Locey opined that Yeomas would benefit from individual

therapy and that her prognosis was good.  (*Id.*).  Locey recommended that Yeomas undergo a

psychiatric evaluation and receive ongoing medication management.  (*Id.*).

On March 5, 2012, Yeomas returned for an appointment with Locey.  (Tr. 440).

Treatment notes indicate that Yeomas continued to maintain her sobriety and was attending GED

classes twice a week.  (*Id.*).  Yeomas reported minimal issues with pain.  (*Id.*).  On March 19,

2012, Yeomas returned for another appointment with Locey.  (Tr. 438).  During the appointment,

Yeomas reported that she had relapsed and used crack cocaine before her previous visit.  (*Id.*).

On March 20, 2012, Yeomas attended an appointment for evaluation of her medication.

(Tr. 436).  Treatment notes indicate that she was prescribed Celexa and Neurontin and that she

was making positive progress on that medication.  (*Id.*).

### B.   Medical Opinion Evidence

#### 1.   Harbinder Toor, MD

On December 9, 2009, state examiner Harbinder Toor ("Toor"), MD, conducted a

consultative internal medicine examination of Yeomas.  (Tr. 233-38).  Yeomas reported chronic

pain in her right shoulder that caused difficulties pushing, pulling, lifting and reaching.  (*Id.*).  In

addition, Yeomas reported lower back pain that was sharp and constant, radiating to her right leg

and causing difficulty standing, walking, sitting, bending and lifting.  (*Id.*).  Yeomas reported

that she was sometimes able to cook, clean, do laundry, shower, bathe and dress herself, and that

she watches television and reads.  (*Id.*).

Upon examination, Toor noted that Yeomas had a slightly abnormal gait with

limping towards the right side and demonstrated moderate back pain.  (*Id.*).  Yeomas declined to

perform the heel and toe walk and could squat twenty percent of full.  (*Id.*).  She used no

assistive devices and had difficulty getting on and off the exam table and changing for the exam

because of pain in her shoulder.  (*Id.*).  She was able to rise from her chair without difficulty.

(*Id.*).

Toor noted that Yeomas's cervical spine showed full flexion, extension, lateral

flexion bilaterally and full rotary movement bilaterally.  (*Id.*).  Toor identified no scoliosis,

kyphosis or abnormality in her thoracic spine. (*Id.*). Toor found that Yeomas's lumbar flexion was limited to twenty degrees, extension zero degrees, lateral flexion thirty degrees, and rotation thirty degrees with pain in the back. (*Id.*). The straight leg raise was positive on both sides at twenty degrees when supine and sitting with pain in the back. (*Id.*). Toor noted pain in her right shoulder with forward elevation to eighty degrees, abduction eighty degrees, and internal and external rotation with pain in the shoulder. Toor found full range of motion in the left shoulder, elbows, forearms and wrists. (*Id.*). He also found full range of motion in the hips, knees and ankles bilaterally, but noted that internal and external rotation of the right hip caused pain. (*Id.*). Toor assessed strength as five out of five in the upper and lower extremities with numbness to light touch in the right leg. (*Id.*). Toor found Yeomas's hand and finger dexterity to be intact and her grip strength to be five out of five bilaterally. (*Id.*). Toor also reviewed an x-ray of Yeomas's lumbosacral spine that indicated a transitional L5 vertebral body, but was otherwise unremarkable. (*Id.*).

Toor diagnosed Yeomas with osteoarthritis in the right shoulder, lumbar disc disease with back pain, balancing problem with numbness in right leg, hypertension, asthma, COPD, depression and diabetes. (*Id.*). He opined that Yeomas had moderate limitations for standing, walking, sitting and lying down and that she had moderate to severe limitations for bending and heavy lifting. (*Id.*). Toor also assessed moderate difficulty pushing, pulling and reaching with her right shoulder. (*Id.*). He also opined that Yeomas should avoid irritants or other factors that precipitate asthma. (*Id.*).

Approximately one year and three months later, on March 8, 2011, Toor conducted another consultative internal medicine examination of Yeomas. (Tr. 340-45). Yeomas reported lower back pain that was sharp and constant, radiating to her right leg and

causing difficulty standing, walking, sitting, squatting, bending, lifting and balancing.  (*Id.*).  She also reported experiencing pain in her right knee due to arthritis for the previous few years.  (*Id.*).  Yeomas reported that she cooks three days per week and cleans and does her laundry weekly.  (*Id.*).  She reported that she is able to shower and dress herself and enjoys watching television and reading.  (*Id.*).

Upon examination, Toor noted that Yeomas did not appear in acute distress, although she had a slightly abnormal gait with limping towards the right side.  (*Id.*).  Yeomas declined to perform the heel and toe walk or squatting due to pain.  (*Id.*).  She used no assistive devices and declined to lie on the examination table.  (*Id.*).  She had difficulty rising from the chair, but needed no help changing for the examination.  (*Id.*).

Toor noted that Yeomas's cervical spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally.  (*Id.*).  Toor identified no scoliosis, kyphosis or abnormality in her thoracic spine.  (*Id.*).  Toor found that Yeomas's lumbar spine forward flexion was limited to ten degrees, lateral flexion twenty degrees and rotation twenty degrees.  (*Id.*).  Yeomas declined to participate in the straight leg raise in either the sitting or supine positions.  (*Id.*).  Toor found full range of motion in the shoulders, elbows, forearms and wrists.  (*Id.*).  He also found full range of motion in the hips, left knee and ankles bilaterally, but noted that she had some pain in the right knee with flexion and extension limited to 145 degrees.  (*Id.*).  Toor assessed strength as five out of five in the upper and lower extremities with numbness in the right leg.  (*Id.*).  Toor found Yeomas's hand and finger dexterity to be intact and her grip strength to be five out of five bilaterally.  (*Id.*).  Toor reviewed an x-ray of Yeomas's lumbosacral spine that demonstrated no significant bony abnormality.  (*Id.*).

Toor diagnosed Yeomas with history of back pain, arthritis in the right knee, diabetes, asthma, COPD and hypertension.  (*Id.*).  He opined that Yeomas had moderate limitations for standing, walking and sitting for prolonged periods.  (*Id.*).  Toor also assessed moderate to severe limitations for squatting and heavy lifting and noted that pain and balance interfere with Yeomas's routine.  (*Id.*).  He also opined that Yeomas should avoid irritants or other factors that precipitate asthma.  (*Id.*).  According to Toor, there were no other medical limitations suggested by his evaluation.  (*Id.*).

### 2.    Adele Jones, PhD

On December 1, 2009, state examiner Adele Jones ("Jones"), PhD, conducted a consultative psychiatric evaluation of Yeomas.  (Tr. 239-43).  Yeomas reported that she took a bus to the examination.  (*Id.*).  Yeomas also reported that she had completed the eleventh grade and that she was in special education classes after seventh grade.  (*Id.*).  Yeomas had not been employed since 2000.  (*Id.*).  According to Yeomas, she was last employed as a prep cook, but had to leave her job due to back problems and associated paralysis.  (*Id.*).  Yeomas reported that her longest period of employment was four months.  (*Id.*).

According to Yeomas, she was hospitalized for two weeks in 1987 for suicidal ideation, had previously received mental health treatment at GMHC for approximately one year and was currently receiving treatment at Restart for substance abuse issues.  (*Id.*).  Yeomas reported difficulty sleeping, poor appetite, social withdrawal and recurrent thoughts of suicide. (*Id.*).  Yeomas also reported a history of consuming alcohol, marijuana and cocaine.  (*Id.*). According to Yeomas, she was currently undergoing addiction treatment, although she continued to use marijuana.  (*Id.*).

Yeomas reported that she was able to care for her personal hygiene and could cook, manage money and take public transportation. (*Id.*). According to Yeomas, she was able to clean and do laundry with assistance from her boyfriend and daughter. (*Id.*). Yeomas reported shopping "wears her out." (*Id.*). She characterized her relationships with her family and friends as "all right" and reported that she spends her time writing poetry and attending group therapy. (*Id.*).

Upon examination, Jones noted that Yeomas appeared casually dressed and groomed, although her hair was somewhat unkempt. (*Id.*). Jones opined that Yeomas had fluent and clear speech with adequate language, coherent and goal-directed thought processes, somewhat agitated affect, dysthymic mood, clear sensorium, full orientation, fair insight, adequate judgment and average intellectual functioning with an appropriate general fund of information. (*Id.*). Jones noted that Yeomas's attention and concentration were intact. (*Id.*). According to Jones, Yeomas could count backwards and perform simple calculations, but made some mistakes when completing serial threes. (*Id.*). Jones opined that Yeomas's mistakes owed to her limited education, rather than to an attention or concentration impairment. (*Id.*). Yeomas's immediate memory skills were intact. (*Id.*). According to Jones, Yeomas could recall three objects immediately, two out of three objects after five minutes and could complete five digits forward and zero digits backward. (*Id.*). Again, Jones opined that Yeomas's inability to complete digits backwards stemmed from difficulties with math and not a memory impairment. (*Id.*).

According to Jones, Yeomas could follow and understand simple directions and instructions, perform simple and complex tasks independently, maintain attention and concentration, maintain a regular schedule and learn new tasks, make appropriate decisions,

relate adequately with others and appropriately deal with stress. (*Id.*). Jones opined that Yeomas appeared to have a substance abuse problem and diagnosed her with alcohol abuse and cannabis and cocaine dependence. (*Id.*). According to Jones, Yeomas's substance abuse did not appear to be significant enough to interfere with her ability to function on a daily basis. (*Id.*).

Over a year later, on March 8, 2011, Jones conducted another consultative psychiatric evaluation of Yeomas. (Tr. 301-05). Yeomas reported that she was living in a halfway house. (*Id.*). Yeomas also reported that she had completed the eleventh grade in special education classes. (*Id.*). Yeomas again reported that she had been unemployed since 2000 and had left her previous job as a prep cook due to transportation issues and back problems. (*Id.*).

According to Yeomas, she had been hospitalized for two weeks in 1987 for suicidal ideation and had recently returned to GMHC for mental health treatment. (*Id.*). Yeomas reported difficulty sleeping, weight gain, dysphoric mood, crying, diminished self-esteem, diminished sense of pleasure, social withdrawal, recurrent thoughts of suicide, nervousness, flashbacks and hypervigilance. (*Id.*). Yeomas also reported a history of auditory hallucinations and chronic difficulty learning new tasks, although she reported that her memory had improved since she had become sober. (*Id.*). Yeomas reported that she last consumed alcohol four years ago and had not used marijuana or cocaine for the past forty-five days. (*Id.*).

Yeomas reported that she was able to care for her personal hygiene and could cook, manage money and take public transportation. (*Id.*). According to Yeomas, she was unable to clean or shop because she could not carry things. (*Id.*). Yeomas reported distancing herself from her friends and family and spending time reading. (*Id.*).

Jones noted that Yeomas appeared casually dressed and groomed. (*Id.*). Jones opined that Yeomas had fluent and clear speech with adequate language, coherent and

goal-directed thought processes, full range affect, nervous mood, clear sensorium, full orientation, good insight and judgment and below average intellectual functioning with an appropriate general fund of information.  (*Id.*).  Jones noted that Yeomas's attention and concentration were intact with counting, simple calculations and serial threes.  (*Id.*).  Jones found Yeomas's memory mildly impaired due to either anxiety or a possible learning disorder.  (*Id.*).  According to Jones, Yeomas could recall three objects immediately, two out of three objects after five minutes and could complete five digits forward and three digits backward.  (*Id.*).

According to Jones, Yeomas could follow and understand simple directions and instructions, perform simple and complex tasks independently, maintain attention and concentration, maintain a regular schedule, make appropriate decisions, relate adequately with others and appropriately deal with stress, but had chronic problems learning new tasks.  (*Id.*).  Jones opined that Yeomas appeared to have psychiatric and substance abuse problems and diagnosed her with severe major depressive disorder, with psychotic features, post-traumatic stress disorder, and cannabis and cocaine dependence.  (*Id.*).  According to Jones, Yeomas's psychiatric and substance abuse problems did not appear significant enough to interfere with her ability to function on a daily basis.  (*Id.*).

### 3. T. Harding, Psychology

On December 22, 2009, agency medical consultant Dr. T. Harding ("Harding") completed a Psychiatric Review Technique.  (Tr. 244-57).  Harding concluded that Yeomas's mental impairments did not meet or equal a listed impairment.  (Tr. 244, 252).  According to Harding, Yeomas suffered from moderate limitations in her activities of daily living, ability to maintain social functioning and to maintain concentration, persistence or pace.  (Tr. 254).  According to Harding, there was insufficient evidence to determine whether Yeomas had

suffered from repeated episodes of deterioration.  (*Id.*).  Harding completed a mental Residual

Function Capacity ("RFC") assessment.  (Tr. 258-61).  Harding opined that Yeomas suffered

from moderate limitations in her ability to understand, remember and carry out detailed

instructions, maintain attention and concentration for extended periods, sustain an ordinary

routine without supervision and set realistic goals or make plans independently of others.

(Tr. 259).  According to Harding, Yeomas was able to perform the basic demands of simple,

unskilled work.  (Tr. 260).

> Over a year later, on March 27, 2011, Harding completed another Psychiatric

Review Technique.  (Tr. 346-59).  Harding concluded that Yeomas's mental impairments did not

meet or equal a listed impairment.  (Tr. 349, 351, 354).  According to Harding, Yeomas suffered

from mild limitations in her activities of daily living and ability to maintain social functioning

and from moderate limitations in her ability to maintain concentration, persistence or pace.

(Tr. 356).  In addition, according to Harding, there was insufficient evidence to determine

whether Yeomas had suffered from repeated episodes of deterioration.  (*Id.*).  Harding completed

a mental RFC assessment.  (Tr. 360-63).  Harding opined that Yeomas suffered from moderate

limitations in her ability to understand, remember and carry out detailed instructions and set

realistic goals or make plans independently of others.  (Tr. 360-61).  According to Harding,

Yeomas is able to understand and carry out simple instructions, use appropriate judgment to

make simple, work-related decisions, respond appropriately to supervisors and coworkers, deal

with changes in a routine work setting and can effectively, appropriately and independently

perform activities of daily living on a sustained basis.  (Tr. 362).

III.     <u>**Non-Medical Evidence**</u>

        In her application for benefits, Yeomas reported that she was born in 1965. (Tr. 127).  Yeomas reported that she had completed the eleventh grade and had previously been employed at a copy store as a bindery and as a cook.  (Tr. 161).  According to Yeomas, she was last employed as a prep cook, but left that position due to transportation issues and her medical condition.  (Tr. 160-61).

        Yeomas reported that she does not care for any family members or pets, but is able to care for her own personal hygiene without assistance and can prepare her own meals daily.  (Tr. 170).  Yeomas reported that she is able to complete household chores, including cleaning, but does "very little at a time" and indicated that she needs assistance with some chores like laundry.  (Tr. 171-72).  According to Yeomas, she leaves her residence three times a week to attend group therapy and goes grocery shopping, with assistance, once a month for approximately two hours.  (Tr. 172).  Yeomas uses public transportation without assistance. (*Id.*).

        Yeomas reported that she enjoys writing poetry, watching television and talking on the telephone.  (Tr. 173).  Yeomas attends a church group and reported no problems getting along with others.  (*Id.*).  According to Yeomas, her medical conditions limit her ability to sit, stand and walk for extended periods, as well as her ability to climb stairs, kneel, squat and reach. (Tr. 174).  Yeomas estimated that she could walk approximately two blocks without resting for approximately five to ten minutes.  (Tr. 175).  In addition, Yeomas reported that she did not have any problems paying attention, following instructions, remembering things or getting along with people in authority positions.  (*Id.*).

Yeomas submitted a disability report in connection with her appeal from the Administration's initial denial. (Tr. 191-96). In the report, she indicated that she experienced episodes involving her knee, legs and back in March 2011. (*Id.*). According to Yeomas, she had scheduled a follow-up appointment with Maurer for August 2011 and had been to the RGH Emergency Department in February and May 2011 complaining of extreme pain in her legs and back. (*Id.*). In addition, on April 26, 2012, Yeomas submitted an updated disability report in connection with her appeal of the decision denying her claim for benefits. (Tr. 225-32). In the report, Yeomas indicated that her symptoms were unchanged and that she was receiving mental health treatment from Locey. (*Id.*).

During the administrative hearing, Yeomas testified that she previously had two different positions as a cook, but stopped working because of difficulty finding transportation to work. (Tr. 18-22). Yeomas also testified that she had completed the eleventh grade and had not obtained her GED. (Tr. 39).

According to Yeomas, back pain is her most serious health problem. (Tr. 24). Yeomas testified that she underwent surgery in 2000 because a disc in her back was impinging upon a nerve, resulting in paralysis. (*Id.*). After the surgery, Yeomas had to relearn how to walk. (*Id.*). According to Yeomas, despite the surgery, she has continued to suffer lower back pain. (*Id.*). Yeomas testified that she takes Flexural and ibuprofen to alleviate her back pain, although they are not very effective. (Tr. 24-26). Yeomas testified that her back pain was aggravated in 2012 when she fell on ice. (*Id.*).

Yeomas testified that her back pain limits her ability to walk, lift, sit and stand. (Tr. 27). According to Yeomas, she can complete household chores "little by little," but needs assistance to complete the laundry, vacuuming and mopping. (Tr. 38). In addition, according to

Yeomas, her medications cause drowsiness.  (Tr. 37).  Yeomas testified that she also experiences

pain caused by arthritis in her knee, but testified that she had not sought treatment due to her

concern over prescription medication.  (Tr. 33-34).  Yeomas also reported some difficulty

sleeping due to her depression.  (Tr. 28-29).

      Vocational Expert, Julie Andrews ("Andrews"), also testified during the hearing.

(Tr. 40-45).  The ALJ first asked Andrews to characterize Yeomas's previous employment.

(Tr. 41).  According to Andrews, Yeomas had been employed as a cook and kitchen helper.

(*Id.*).

      The ALJ then asked Andrews whether a person of the same age as Yeomas, with

the same education and vocational profile, who was able to understand, remember and follow

only simple instructions and who could perform the full range of light work with occasional

postural limitations, but had to avoid concentrated exposure to respiratory irritants, would be

able to perform any of the work that Yeomas previously performed.  (Tr. 41-42).  Andrews

testified that such an individual would be unable to perform the previously-identified positions,

but would be able to perform other positions in the national economy, including

housekeeper/cleaner and counter clerk positions.  (Tr. 42).  Both of these positions, Andrews

testified, were unskilled and were performed at the light exertion level.  (*Id.*).  The ALJ then

asked Andrews whether jobs would exist for the same individual with the same limitations,

except that the individual was limited to sedentary as opposed to light exertion.  (Tr. 43).

Andrews testified that such an individual could perform positions in the national and regional

economy, including the positions of labor pinker and surveillance systems monitor.  (*Id.*).  The

ALJ then asked Andrews to assume the same limitations, along with the added limitation of

being off-task approximately twenty percent of the time.  (*Id.*).  Andrews opined that such an

individual would not be able to maintain employment on a full-time, competitive basis.  (*Id.*).


**DISCUSSION**

**I.**     **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)    whether the claimant is currently engaged in substantial gainful activity;

(2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

> (5)    if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## A.    <u>The ALJ's Decision</u>

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims. (Tr. 65-75). Under step one of the process, the ALJ found that Yeomas has not engaged in substantial gainful activity since November 5, 2010, the application date. (Tr. 67). At step two, the ALJ concluded that Yeomas has the severe impairments of low back pain, lumbar, asthma, COPD, obesity, diabetes mellitus, and substance use disorders, not material. (*Id.*). The ALJ concluded that Yeomas's mental impairments, including major depressive disorder, severe with psychotic features, and post-traumatic stress disorder were not severe because they did not cause more than minimal limitation in Yeomas's ability to perform basic mental work activities. (Tr. 67-68). In reaching this conclusion, the ALJ relied upon the psychiatric evaluations conducted by Jones and determined that Yeomas has no limitations in her ability to perform activities of daily living and mild limitations in social functioning and her ability to maintain concentration, persistence and pace. (*Id.*) At step three, the ALJ determined that Yeomas does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments. (Tr. 69). The ALJ concluded that Yeomas has the RFC to understand, remember and follow simple instructions and perform the full range of

light work, except that she can only occasionally stoop, balance, kneel, climb, crouch and crawl and she must avoid concentrated or excessive exposure to respiratory irritants. (*Id.*). At step four and five, the ALJ determined that Yeomas was unable to perform her prior work, but that other jobs existed in the national and regional economy that Yeomas could perform, including the positions of housekeeper/cleaner and counter clerk. (Tr. 73-74). Accordingly, the ALJ found that Yeomas is not disabled. (*Id.*).

**B.      Yeomas's Contentions**

Yeomas contends that the ALJ's determination that she is not disabled is not supported by substantial evidence and was the product of legal error. (Docket # 10-1). First, Yeomas contends that the Appeals Council erred when it failed to properly consider the GMHC records of Yeomas's mental health treatment submitted by Yeomas on appeal. (*Id.* at 10-12). Next, Yeomas contends that the ALJ failed to fulfill his duty to develop the record because he failed to request the GMHC mental health records. (*Id.* at 12-13). With respect to the ALJ's mental RFC assessment, Yeomas contends that it is flawed because it failed to adequately account for limitations assessed by Jones and Harding. (*Id.* at 21-23). Third, Yeomas contends that the ALJ erred because he failed to specifically consider whether Yeomas's impairments satisfied Listing 1.04A. (*Id.* at 14-16). Fourth, Yeomas challenges the ALJ's physical RFC assessment on the grounds that he failed to give appropriate weight to the opinions of Yeomas's treating physicians, that he failed to request opinions from Yeomas's treating physicians, and that the RFC analysis is not otherwise supported by substantial evidence. (*Id.* at 16-21, 23-24). Fifth, Yeomas contends that the ALJ failed to properly assess her credibility. (Tr. 24-26). Finally, Yeomas contends that the ALJ's step five determination is not based upon substantial

evidence because the hypothetical posed to the vocational expert was based upon a flawed RFC analysis.  (*Id.* at 26-27).

## II.    Analysis

### A.    Mental RFC Assessment

Yeomas challenges the ALJ's determination that her mental impairments were not severe.  First, Yeomas contends that the Appeals Council erred by failing to properly consider the GMHC mental health treatment records submitted in connection with her appeal.  (Docket ## 10-1 at 10-12).  Alternatively, Yeomas contends that the ALJ erred in his duty to develop the record because he did not request the records prior to reaching his determination.  (*Id.* at 12-13).  Yeomas also contends that the ALJ's mental RFC assessment failed to account for limitations assessed by Jones and Harding.  (*Id.* at 21-23).

### 1.    GMHC Records

Yeomas challenges the ALJ's determination that her mental impairments were not severe on the grounds that her mental treatment health records were not properly evaluated by the Appeals Council and on the grounds that the ALJ erred by not attempting to obtain the records prior to rendering his decision.

The regulations require the Appeals Council to consider "new and material" evidence if "it relates to the period on or before the date of the [ALJ's] hearing decision."  20 C.F.R. §§ 404.970(b), 416.1470(b); *see Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996).  The Appeals Council, after evaluating the entire record, including the newly-submitted evidence, must "then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of evidence currently of record."  20 C.F.R. §§ 404.970(b), 416.1470(b); *Rutkowski*

*v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010). If "the Appeals Council denies review after

considering new evidence, the [Commissioner's] final decision necessarily includes the Appeals

Council's conclusion that the ALJ's findings remained correct despite the new evidence." *Perez*

*v. Chater*, 77 F.3d at 45 (internal quotation omitted). The newly-submitted evidence then

becomes part of the administrative record and is subject to review. *See id.* "The role of the

district court is to review whether the Appeals Council's action was in conformity with [the]

regulations." *Ahearn v. Astrue*, 2010 WL 653712, *4 (N.D.N.Y. 2010) (citing *Woodford v.*

*Apfel*, 93 F. Supp. 2d 521, 528 (S.D.N.Y. 2000)).

        To require consideration by the Appeals Council, the evidence must be both

"(1) new and not 'merely cumulative of what is already in the record' and (2) material, meaning

'both relevant to the claimant's condition during the time period for which benefits were denied

and probative.'" *Shields v. Astrue*, 2012 WL 1865505, *2 (E.D.N.Y. 2012) (quoting *Jones v.*

*Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)). To be material, there must be "a reasonable possibility

that the new evidence would have influenced the [Commissioner] to decide claimant's

application differently." *Jones v. Sullivan*, 949 F.2d at 60. "If the Appeals Council fails to

consider new, material evidence, 'the proper course for the reviewing court is to remand the case

for reconsideration in light of the new evidence.'" *Ahearn v. Astrue*, 2010 WL 653712 at *4

(quoting *Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009)).

        I find that the Appeals Council did not err. Having reviewed the entire record, I

conclude that there is not a reasonable possibility that the GMHC records would have altered the

ALJ's decision. The records include an intake appointment from March 2011, diagnosing

Yeomas as suffering from depressive disorder and cocaine dependence. (Tr. 433). The record

assesses that "[p]atient would benefit from individual therapy[, and her] [p]rognosis is good."

(*Id.*).  The other records are from March 2012 and primarily relate to Yeomas's ongoing difficulties with substance abuse.  (Tr. 435-40).  In reaching his step two determination, the ALJ relied upon Jones's evaluations, which demonstrated that Yeomas suffered from substance abuse and other mental health impairments, but concluded that the impairments did not interfere with Yeomas's daily functioning.  (Tr. 68).  The ALJ concluded that Yeomas's mental impairments did not cause more than minimal limitations in her ability to perform basic mental work activities and were thus nonsevere.  (*Id.*).  Nothing in the GMHC records conflicts with Jones's evaluations or the ALJ's determination.  Thus, even if the records could be said to constitute "new" evidence, they are not material because there is no reasonable possibility that they would have altered the ALJ's determination.  *See Ferguson v. Astrue*, 2013 WL 639308, *4 (N.D.N.Y. 2013) (remand not required where "the opinions and diagnoses offered by both the therapists and psychiatrist [did] not contradict any of the ALJ's findings" and where "[t]he new evidence [was] clearly not probative and, even if received prior to the decision of the ALJ, would not have influenced the decision"); *Duross v. Comm'r of Soc. Sec.*, 2008 WL 4239791, *4 (N.D.N.Y. 2008) (the new evidence "is not material because there is no reasonable possibility that it would have influenced the Commissioner to decide [plaintiff's] application differently").

I likewise conclude that any error committed by the ALJ in failing to obtain the GMHC treatment records prior to issuing his determination was harmless.  As an initial matter, little information in the record before the ALJ suggested that the records even existed.[5]  (Tr. 29, 34, 160, 163, 192-93, 239, 301).  Despite the minimal references in the record to ongoing mental health issues, the Administration nonetheless recognized that Yeomas might suffer from mental impairments and developed the record by ordering psychiatric consultative examinations.  *See*

---

[5]  Yeomas correctly states that GMHC was listed as a provider in a submission dated April 26, 2012. (Tr. 226, 232).  Yet, as the government noted, this submission post-dates the ALJ's March 21, 2012 determination.

*Cobb v. Astrue*, 2009 WL 3206731, *5 & n.3 (M.D.N.C. 2009) ("regardless of why the treatment records were not obtained, it appears the ALJ properly fulfilled his duty to develop the record regarding [p]laintiff's mental impairments by ordering a psychiatric consultation"); *Harper v. Chater*, 1996 WL 193860, *4 (N.D. Cal. 1996) ("[t]he mention of anxiety and a single visit to a psychologist does not create a duty for the ALJ to retrieve records[;] . . . [i]n any case, the ALJ fulfilled his duty to develop the record by taking the step of ordering a consultative examination). In any event, even assuming the ALJ should have requested the records, the records were not material because there is no reasonable possibility that they would have altered the ALJ's step two determination.[6]

## 2.    **Evaluations of Opinion Evidence**

I turn next to Yeomas's contention that the ALJ's mental RFC assessment was flawed because the ALJ improperly rejected the March 8, 2011 opinion of Jones and because the ALJ otherwise failed to account for the limitations assessed by Jones and Harding, the non-examining state consultative psychiatrist.  (Docket # 10-1 at 21-23).

Yeomas contends the ALJ improperly rejected Jones's March 8, 2011 medical opinion and in doing so failed to discuss learning limitations identified by Jones.  Specifically, Yeomas contends that the ALJ failed to account for her "chronic problems with learning."  In addition, Yeomas maintains that the ALJ failed to assign any weight to Harding's opinions and thus overlooked the moderate limitations assessed by Harding.

---

[6] To the extent Yeomas argues that the ALJ erred at step two by determining that her mental impairments were not severe, I conclude that any error, to the extent it exists, was harmless because the ALJ proceeded through the remainder of the sequential analysis and considered Yeomas's mental impairments when formulating the RFC. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (an error at step two may be harmless if the ALJ identifies other severe impairments at step two, proceeds through the remainder of the sequential evaluation process and specifically considers the "nonsevere" impairment during subsequent steps of the process); *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 311-12 (W.D.N.Y. 2013) ("[a]s a general matter, an error is an ALJ's severity assessment with regard to a given impairment is harmless . . . when it is clear that the ALJ considered the claimant's [impairment] and their effect on his or her ability to work during the balance of the sequential evaluation process") (internal quotations omitted).

An ALJ should consider "all medical opinions received regarding the claimant."

*See Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R.

§ 404.1527(d)).  When evaluating medical opinions, regardless of their source, the ALJ should

consider the following factors:

> (1)     the frequency of examination and length, nature, and extent
>         of the treatment relationship,
>
> (2)     the evidence in support of the physician's opinion,
>
> (3)     the consistency of the opinion with the record as a whole,
>
> (4)     whether the opinion is from a specialist, and
>
> (5)     whatever other factors tend to support or contradict the
>         opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Spielberg v. Barnhart*,

367 F. Supp. 2d at 281 ("factors are also to be considered with regard to non-treating sources,

state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(d) and (e)); *House*

*v. Astrue*, 2013 WL 422058, *2 (N.D.N.Y. 2013) ("[m]edical opinions, regardless of the source

are evaluated considering several factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c)").

Under the regulations, both Jones and Harding are acceptable medical sources, and their opinions

should have been considered by the ALJ.  20 C.F.R. § 404.1513.

I disagree with Yeomas that the ALJ rejected Jones's March 8, 2011 decision.  In

his decision, the ALJ discussed Jones's March 8, 2011 opinion and specifically noted Jones's

assessment that Yeomas had "chronic problems learning new tasks."  (Tr. 67).  I agree with

Yeomas, however, that the ALJ failed to discuss or assign weight to the opinions of Harding.

Any error by the ALJ in this respect was harmless, however, because both Harding's and Jones's

opinions were consistent with the ALJ's RFC assessment.  *See Amberg v. Astrue*, 2010 WL

2595218, *4 (N.D.N.Y.) ("although the ALJ's stated reason for discounting the [doctor's] opinions may not have been supported by the record, any error in this regard was harmless because the ALJ's RFC finding is consistent with [the] opinions") (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration")), *report and recommendation adopted*, 2010 WL 2595130 (N.D.N.Y. 2010).

In 2009, Harding opined that Yeomas was moderately limited in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without supervision and set realistic goals or make plans independently of others. (Tr. 259). Despite these limitations, Harding opined that Yeomas was capable of performing the basic demands of simple, unskilled work. (Tr. 260). In 2011, Harding opined that Yeomas was moderately limited in her ability to understand, remember and carry out detailed instructions and set realistic goals or make plans independently of others. (Tr. 360-61). Despite these limitations, Harding opined that Yeomas was able to understand and carry out simple instructions, use appropriate judgment to make simple, work-related decisions, respond appropriately to supervisors and coworkers, deal with changes in a routine work setting, and effectively, appropriately and independently perform activities of daily living on a sustained basis. (Tr. 362). As discussed above, Jones opined in 2011 that Yeomas had "chronic" problems learning new tasks, but that she could follow and understand simple directions and instructions, perform simple and complex tasks independently, maintain attention and concentration, maintain a regular schedule, make appropriate decisions, relate adequately with others and appropriately deal with stress. (Tr. 301-05). The ALJ determined that Yeomas could maintain attention and concentration to understand, remember and follow

simple instructions.  (Tr. 69).  Although the ALJ did not discuss each of the moderate limitations identified by Harding, his RFC assessment accounted for those limitations and was consistent with Harding's opinion that Yeomas could understand and carry out simple instructions.  The ALJ explicitly acknowledged the limitation identified by Jones and accounted for it by limiting Yeomas to unskilled work consistent with Jones's opinion that Yeomas retained the capacity to follow and understand simple direction and instructions.  For these reasons, I conclude that the ALJ properly evaluated and incorporated into his RFC assessment the limitations identified in Jones's and Harding's opinions, even if he did not explicitly discuss each limitation.  *See Retana v. Astrue*, 2012 WL 1079229, *6 (D. Colo. 2012) (ALJ was not required to discuss thoroughly each moderate limitation; "ALJ's RFC adopted some of [doctor's] moderate limitations such as restricting plaintiff to unskilled work not involving complex tasks, reflecting plaintiff's moderate limitations in his ability to carry out detailed instructions and to maintain concentration for extended periods").  Even if the ALJ erred by failing to discuss Harding's opinion, such error was harmless because consideration of Harding's opinion would not have altered the ALJ's RFC assessment.  *See Crawford v. Astrue*, 2014 WL 4829544, *23 (W.D.N.Y. 2014) (failure to consider opinion of non-examining psychiatrist harmless; "although the ALJ did not discuss the moderate limitations assessed by [non-examining psychiatrist], he incorporated moderate limitations into his RFC by restricting [plaintiff] to jobs that require an individual to understand, remember, and carry out simple instructions").

**B.**     **Step Three Determination**

Yeomas contends that the ALJ erred when he concluded that she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F. R. Pt. 404, Subpt. P, App. 1.  Specifically, Yeomas contends that the ALJ

failed to provide any explanation for his determination that she did not meet or medically equal the requirements of Listing 1.04A.  Further, Yeomas contends that the evidence in the record establishes that her impairments meet the requirements of that listing.  The government disagrees with Yeomas, asserting that although the ALJ's analysis at step three was minimal, his rationale may be gleaned from his discussion of the medical evidence.  The government also contends that Yeomas has failed to present any evidence that she satisfies the requirements of Listing 1.04A.  (Docket # 17 at 3-4).

If a claimant's impairments meet or medically equal the criteria set forth in Appendix 1 to Subpart P of Part 404 of the regulations, the claimant is automatically entitled to benefits.  *See DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) ("[t]he Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability") (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).  The claimant carries the burden of demonstrating that her impairments meet or are equal in severity to one of the listings, and the claimant is required to show that her impairment meets each of the medical criteria set forth in the listing.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (impairment does not qualify if it "manifests only some of those criteria, no matter how severely").

An ALJ is required to explain his determination that a claimant failed to meet or equal the listings "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the [l]istings." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009).  Nevertheless, "[a]n ALJ's unexplained conclusion [at] step three of the analysis may be upheld where other portions of the decision and 'other clearly credible evidence' demonstrate that the conclusion is supported by substantial evidence." *Ryan v. Astrue*, 5

F. Supp. 3d 493, 507-08 (S.D.N.Y. 2014) (citing *Berry*, 675 F.2d at 468-69 (affirming ALJ's decision at step three even though it did not articulate its rationale "since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence")); *see also Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 113 (2d Cir. 2010) ("[a]lthough we have cautioned that an ALJ should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment, the absence of an express rationale . . . does not prevent us from upholding [the determination] so long as we are able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence") (internal quotations omitted)*; Sava v. Astrue*, 2010 WL 3219311, *4 (S.D.N.Y. 2010) (affirming determination of ALJ at step three where there was "sufficient uncontradicted evidence in the record to provide substantial evidence for [that] conclusion").  In contrast, "where the evidence on the issue of whether a claimant meets or equals the listing requirements is [in] equipoise and 'credibility determinations and inference drawing is required of the ALJ' to form his conclusions at step [three], the ALJ must explain his reasoning."  *Ryan v. Astrue*, 5 F. Supp. 3d at 507-08 (quoting *Berry*, 675 F.2d at 469).

Listing 1.04A, entitled "Disorders of the spine," (the "Listing") provides, in relevant part:

> *Disorders of the spine* (*e.g.*, herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in a compromise of a nerve root (including cauda equine) or the spinal cord.  With:
>
> > A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the

lower back, positive straight-leg raising test (sitting and
supine).

20 C.F.R. Part 404, Subpt. P, App. 1.  Thus, to establish that she meets the Listing, Yeomas must

demonstrate that she suffers from nerve root compression and each of the four characteristics set

forth in the Listing during the relevant time period.  Yeomas has marshalled evidence from the

record which she contends supports her argument that she has satisfied the Listing.  The

government contends that Yeomas has not provided evidence in support of each of the

requirements, but inexplicably fails to identify which of the requirements it believes is lacking.

(Docket # 17 at 4).

       With respect to the first requirement, evidence of nerve root compression, I

conclude that the record contains conflicting evidence with respect to this requirement.  The

record demonstrates that in 2002 Yeomas suffered a disc herniation that resulted in

"decompression of the spinal sac" and pain symptoms in her lower extremities, requiring

surgery.  (Tr. 394-97).  Following surgery, Maurer reviewed images of Yeomas's back and

concluded that her ongoing symptoms were mechanical in nature, not the result of a neurological

compressive issue, and opined that surgery was not likely to completely relieve her symptoms.

(Tr. 388-90).  Subsequently, images in 2007 demonstrated progression of the degenerative disc

disease and posterior decompression of the thecal sac with no central canal stenosis.  (Tr. 385).

Additionally, the images revealed a diffuse disc bulge with a small central disc protrusion

abutting the bilateral S1 nerve root.  (*Id.*).  These images support Yeomas's contention that she

suffers from nerve root compression.  *See Kerr v. Astrue*, 2010 WL 3907121, *6 (N.D.N.Y.)

(concluding nerve root compression was suggested by images depicting "impingement in the

thecal sac"), *report and recommendation adopted*, 2010 WL 3893922 (N.D.N.Y. 2010); *Crump*

*v. Astrue*, 2009 WL 2424196, *4 (N.D.N.Y. 2009) (images depicting, among other things, compression of the thecal sac, "provide[d] evidence that plaintiff suffered from nerve root compression"). As the government points out, other evidence in the record, including images of Yeomas's back from 2009 and 2011, were largely unremarkable, demonstrating a transitional L5 vertebral body, but no significant bony abnormality. (Tr. 238, 345).

With respect to "neuro-anatomic distribution of pain," the record is replete with conflicting references that pain radiates into Yeomas's lower extremities (*see*, *e.g.*, Tr. 233, 263, 298, 340, 388, 390) and that it does not (*see*, *e.g.*, Tr. 330, 332, 412). With respect to range of motion in her spine, there are several statements in the record suggesting that Yeomas had limited range of motion in her back or that she suffered pain upon movement. (*See*, *e.g.*, Tr. 235, 284, 332, 342). For example, both of Toor's examinations demonstrated restricted range of motion in Yeomas's lumbar spine. (Tr. 235, 342).

The third characteristic of the Listing is motor loss (demonstrated by atrophy or muscle weakness) accompanied by sensory or reflex loss. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04A. Again, the record contains conflicting evidence with respect to this requirement. Several references in the record suggest that Yeomas experienced numbness, particularly in her right leg. (Tr. 236, 343). Specifically, both of Toor's examinations demonstrated "numbness to light touch in the right leg." (*Id.*). Again, other notations in the record suggest otherwise. (Tr. 330, 332, 412). With respect to motor loss demonstrated through atrophy or muscle weakness, the record contains both multiple indications that Yeomas did not suffer from either atrophy or weakness (Tr. 235, 236, 263, 264, 330, 332, 343, 412, 413) and that she might have experienced some weakness in her right leg (Tr. 268, 298). In addition, Yeomas was apparently unable to fully squat or walk on her heels and toes and had difficulty rising from

a seated position.  (Tr. 235, 341-42).  *See Ryan*, 5 F. Supp. 3d at 509 (motor loss can be

demonstrated through difficultly rising from a seated position, performing the heel or toe walk or

squatting) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00 (E)(1) (motor loss can be

demonstrated by an "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting

position")); *Norman v. Astrue*, 912 F. Supp. 2d 33, 80 (S.D.N.Y. 2012) ("[w]ith respect to

muscle weakness, however, while the medical evidence is not overwhelming – it does indicate

that plaintiff may have had some difficulty with walking on his heels or toes and/or squatting");

*Olechna v. Astrue*, 2010 WL 786256, *6 (N.D.N.Y. 2010) ("[p]laintiff's muscle weakness was

also documented in his inability or difficulty with [heel] and toe walking").  Finally, there are

several notations in the record indicating a positive straight leg test (Tr. 235, 263, 264 – right leg;

Tr. 235 – left leg).

   In this case, the ALJ's determination does not make clear whether he considered

the Listing, much less which of the Listing criteria Yeomas failed to establish.  As discussed at

length above, I agree with the government that some evidence in the record appears to support a

determination that Yeomas has failed to establish some of the Listing criteria.  On the other hand,

conflicting evidence appears to exist for each of the criteria.  The conflicting evidence is

sufficient to require the ALJ to assess the totality of the evidence and to explain his conclusion.

"In light of the ALJ's failure to explain his reasoning and the conflicting medical evidence in the

record, this Court cannot conclude" that the ALJ's determination is supported by substantial

evidence.  *See Norman v. Astrue*, 912 F. Supp. 2d at 41; *Quinones v. Colvin*, 2014 WL 6885908,

*6 (W.D.N.Y. 2014) ("[b]ecause the ALJ failed to provide an analysis of [p]laintiff's back

impairments sufficient to enable this Court to conclude that the step three finding is supported by

substantial evidence, remand for further proceedings is warranted); *Ryan*, 5 F. Supp. 3d at 509

("[b]ecause there is evidence that plaintiff's impairments meet each of the requirements for [L]isting 1.04A, the ALJ must provide an explanation of his reasoning as to why he believes the requirements are not met and explain the credibility determinations and inferences he drew in reaching that conclusion[;] . . . [b]ecause the ALJ failed to address the potential applicability of [L]isting 1.04A to what appears to be medical evidence that potentially meets the listing requirements, I cannot conclude that there is sufficient uncontradicted evidence in the record to provide substantial evidence for the conclusion that [p]laintiff failed to meet step three") (internal quotation omitted); *Sekavec v. Colvin*, 2013 WL 3220065, *4 (W.D. Ark. 2013) ("[t]he ALJ failed to support his finding at step three that [p]laintiff's impairments did not equal a listed impairment, and it is not clear if the ALJ even considered whether the [p]laintiff met the requirements of Listing 1.04"); *Cuevas v. Colvin*, 2013 WL 1120088, *5 (C.D. Cal. 2013) ("neither the ALJ nor the medical expert adequately considered and discussed whether [p]laintiff met or equaled Listing 1.04(A)[;] . . . [the government] contends that the ALJ's discussion of the medical evidence provides sufficient reasoning to support the ALJ's conclusory step three findings[;] . . . [although] [t]he ALJ did discuss the medical evidence and did reference various findings concerning nerve root compression, radiculopathy, straight leg raising tests, and the . . . surgery to address [p]laintiff's nerve root compression . . . , the ALJ did not explain how these findings comport or fail to comport with Listing 1.04(A)"); *Kerr v. Astrue*, 2010 WL 3907121 at *6 ("given the above cited evidence, [p]laintiff was owed a more substantive discussion of why she did not meet Listing 1.04A").  Upon remand, although the ALJ may ultimately conclude that Yeomas's impairments did not meet or equal the Listing, "this possibility does not relieve the ALJ of his obligation to discuss the potential applicability of Listing 1.04A, or at the very least, to provide [Yeomas] with an explanation of his reasoning as to why [Yeomas's] impairments did

not meet any of the listings." *Norman*, 912 F. Supp. 2d at 81.  Accordingly, I conclude that

remand is warranted for the ALJ to consider whether Yeomas meets or equals the requirements

of the Listing and, if not, to provide an explanation for his determination.

      C.      **Yeomas's Remaining Challenges**

      Yeomas also challenges the ALJ's physical RFC assessment, as well as his step

five determination and his credibility determination.  (Docket ## 16-21, 23-24, 26-27).  Because

I have concluded that remand is warranted at step three, I decline to reach Yeomas's remaining

challenges as the ALJ's re-evaluation at step three may affect his analysis of the remaining steps

in the sequential evaluation.  *See Kesinger v. Colvin*, 2015 WL 471274, *2 (D. Kan. 2015)

("[b]ecause the credibility determination and RFC assessment must take place after step three of

the process, proper consideration and explanation of [the listings] will potentially affect the

credibility determination and the RFC assessment[;] [t]herefore, it would be merely an

impermissible advisory opinion for the court to consider those issues at this time"); *Jones v.

Comm'r of Soc. Sec.*, 2014 WL 4715727, *12 (N.D. Ohio 2014) ("[o]n remand, a more thorough

analysis and/or evaluation . . . at Step Three may impact the Commissioner's RFC assessment

and/or later steps in the sequential evaluation"); *Dehart v. Colvin*, 2013 WL 3243137, *5

(S.D. Ind. 2013) ("[a]lthough the [c]ourt found no error with the ALJ's RFC analysis or the

determination at step five, the [c]ourt has determined that the findings are nonetheless tainted for

failure to conduct a proper analysis at step three[;] [t]herefore, on remand, the ALJ is required to

make a new RFC assessment and step five analysis, if necessary, after making a proper finding at

step three"); *Sleight v. Comm'r of Soc. Sec.*, 896 F. Supp. 2d 622, 636 (E.D. Mich. 2012)

("[b]ecause this [c]ourt recommends remand at step three, [p]laintiff's remaining arguments,

which claim error in the ALJ's RFC and credibility assessment, and in the ALJ's weighing of

evidence, are moot"); *Atkinson v. Astrue*, 2011 WL 4085414, *13 (E.D. Cal. 2011) ("[t]he nature of the remand [at step three] is of a sort that will likely impact the ALJ's sequential analysis from step three through step five"); *Shook v. Barnhart*, 2006 WL 4080050, *7 (D. Kan.) ("[b]ecause remand is necessary to apply the correct legal standard at step three, the court need not consider plaintiff's arguments regarding credibility determinations and RFC assessment"), *report and recommendation adopted*, 2006 WL 2884083 (D. Kan. 2006).


## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 9)** is **DENIED**, and Yeomas's motion for judgment on the pleadings **(Docket # 10)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**


_____
             *s/Marian W. Payson*          
                 MARIAN W. PAYSON
            United States Magistrate Judge


Dated: Rochester, New York
          March 10, 2015